J-A02008-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ESTATE OF CALEEM L. JABBOUR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: MAURA NICOTRA | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1952 WDA 2016 |

Appeal from the Order Entered December 15, 2016
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s):  No. 02-15-01692

BEFORE:  BOWES, J., OLSON, J., and KUNSELMAN, J.

MEMORANDUM BY BOWES, J.:                                    **FILED JULY 17, 2018**

Maura Nicotra, individually and in her capacity as Co-Executrix of the Estate of Caleem L. Jabbour ("Decedent"), appeals from the December 15, 2016 order dismissing her petition for citation directed to Arlene Jabbour ("Arlene").[1]  Maura, Decedent's daughter from his first marriage, sought a rule directing Arlene, Decedent's second wife, to show cause why she should

_____

[1] Two petitions for citations were filed in the orphans' court.  The instant appeal involves the orphans' court's dismissal of Maura Nicotra's petition challenging Arlene Jabbour's use of a power of attorney.  Terri L. Vargo, Arlene's daughter and the other Co-Executrix of Decedent's estate, filed a petition on December 22, 2015, seeking a citation directed to Emmet Pais, Maura Nicotra, and Donna Genes to show cause why they should not file an accounting of all property removed and income received from the Decedent's accounting business (generally the "business case.").  In its December 15, 2016 order, the orphans' court dismissed the petition for citation involving the business case, and Ms. Vargo and Arlene appealed at No. 75 WDA 2017.  This Court denied a motion to consolidate the two appeals, although we listed the appeals consecutively for oral argument.

not be required to return funds to Maura personally that Arlene allegedly diverted from an in trust for ("ITF") account while acting as attorney-in-fact for Decedent.[2]  After thorough review, we affirm.

The facts are as follows.  Decedent married Arlene in 1995, and it was the second marriage for both of them.  They each had three children from their first marriages.  Terri L. Vargo is Arlene's daughter and Decedent's stepdaughter, and a Co-Executrix of Decedent's Will, together with Maura Nicotra, Decedent's daughter.

In anticipation of their marriage, Decedent and Arlene entered into an October 10, 1994 nuptial agreement that, *inter alia*, listed their separate assets, waived any interest in each other's pensions, and allocated the sum of $150,000 for Decedent's children.  In an addendum to that agreement, the parties agreed that the sum allocated for Decedent's children could be reduced *pro rata* to cover his institutional care if he suffered a physically disabling injury or accident not fully covered by insurance.  Addendum to Nuptial Agreement, 11/10/94, at ¶20.  Another nuptial agreement was

---

[2] The within appeal is proper pursuant to Pa.R.A.P. 342, which provides that

> (a) General rule. An appeal may be taken as of right from the following orders of the Orphans' Court Division:
>     . . . .
>     (6)  An order determining an interest in real or personal property;

Pa.R.A.P. 342(a)(6).

executed on August 25, 1998, after the marriage, that provided that all property owned by the parties during their marriage, not specifically exempted by the Agreement, was marital property. Nuptial Agreement, 8/25/98, at 2-3. It also stated that the parties were free to gift to each other or devise any interest in properties that they had or acquired during the marriage, and that the Agreement superseded all pre-existing agreements between the parties related to the subject matter covered. *Id*. at 3. An addendum to that Agreement was executed on November 30, 2007, increasing the sum designated for Decedent's children to $200,000. In addition, Decedent and Arlene executed a Joint and Mutual Will dated November 25, 1998, which was admitted to probate.[3]

---

[3] The Joint Will provided that:

> C. There is approximately $150,000.00 derived from Caleem's liquid investments titled solely in his name, and entrusted for his children in various instruments. From these funds, it is agreed that the parties or their Co-Executrices, or other assigns, shall spend such sums as are reasonable and desirable for Caleem's medical care, whether as an outpatient or inpatient, as well as the cost of his care in a nursing home or other personal care facility. The balance of such funds thereafter remaining, shall pass and be divided equally among Caleem's living children, RENEE JABBOUR, MAURA NICOTRA, and DANA JABBOUR, and their issue per stirpes. . . .

> D. All other property of the parties shall pass to the survivor, or as set forth in any beneficiary designations of such property, where applicable.

*(Footnote Continued Next Page)*

Decedent was an accountant operating as a sole proprietorship, C.L. Jabbour, PA. The practice consisted largely of tax return preparation for about 400 clients, and general accounting services for approximately twenty to thirty business clients.

On August 4, 2014, Decedent suffered a stroke, and thereafter, he was unable to perform tax and accounting services for his clients. Nine days later, Arlene arranged for Attorney Gary Kalmeyer to meet with Decedent to discuss a power of attorney ("POA"). She told the attorney that she needed to get access to money to pay her husband's medical expenses. Attorney Kalmeyer met with Decedent privately for purposes of discussing a POA, and he testified that the Decedent was lucid and competent. N.T., 10/12-13/16, at 262, 286, 320-323. Decedent executed the document naming his wife as his attorney-in-fact.

The POA conferred upon the agent the power to "sign, make, execute, acknowledge and deliver any and all documents, contracts, checks, drafts, deposits, withdrawals, assignments, transfers, acceptances, and all other

_(Footnote Continued)_ ─────────────

Arlene elected to take her marital share against the Joint Will. Title 20 Pa.C.S.§ 2203 entitles a surviving spouse to take a one-third share of specified categories of property, including the probate estate as well as assets nominally transferred during the decedent's lifetime (_inter vivos_) as to which the decedent retained control of at the time of his death, and the total amount of the elective share is reduced by other property and assets the surviving spouse obtained from the decedent by other means. **See** 20 Pa.C.S. § 2204; **In re Trust Under Deed of Kulig**, 175 A.3d 222 (Pa. 2017).

undertakings of any kind, including but not limited to: deposit or withdraw money . . . in any bank . . . and, even change insurance policy beneficiaries." POA, 8/13/14, at 2. It also contained the broad catchall provision granting Arlene "full power and authority to do all and every act . . . as if I might do if personally present." *Id*.

On August 18, 2014, Arlene went to the First Commonwealth Bank with the POA for purposes of gaining access to a savings account there that Decedent had established in his own name in 1997, and re-designated in 2009 as an ITF account for his daughter, Maura. Arlene utilized the POA to close the account, transfer the money into an existing account in her name, and to add Decedent to the latter account. She and Decedent subsequently had full access to the funds. As of the date of the transfer, the ITF account contained $106,209.83.

In the succeeding months, Arlene continued to deposit her social security and pension checks into the joint account; Decedent's social security checks were deposited automatically into the account. Arlene distinguished between withdrawals for her own use and withdrawals for Decedent's expenses by the numbers on the checks. With Decedent's funds, she purchased a stair lift, a bed, a refrigerator, and a hot water tank, and paid doctor co-pays.

Decedent died on December 22, 2014. The 1998 Joint Will subsequently was admitted to probate, designating Maura and Ms. Vargo as

Co-Executrices. On December 29, 2015, Maura filed the instant petition for citation with the orphans' court, in both her individual and representative capacities. She requested that a citation issue directing Arlene to show cause why she should not be required to return the sum of $106,209.83 to Maura individually, the beneficiary on the ITF account. Following the close of discovery, Maura filed a motion for summary judgment. The orphans' court denied the motion, and held an evidentiary hearing on October 12 and 13, 2016.

Following the hearing, the court found that Arlene did not misuse the POA to her advantage or convert funds lawfully belonging to the Decedent or to Maura. The court credited Arlene's representations that she did not expend the Decedent's funds for her own expenses. The court ordered Arlene to provide to the Estate a detailed list of all expenses paid on behalf of her late husband both prior to and after his death, "with receipts if available," and to tender the balance of the $106,209.83 remaining from the closed ITF account to the Estate.[4]

Maura timely appealed. She alleges that the orphans' court erred by not ordering that the balance of the money be returned to her individually

---

[4] Although Arlene asserts on appeal that the money in the joint account is hers, she did not appeal or file a cross-appeal from that portion of the order directing her to tender the balance of the $106,209.83 remaining from the closed ITF account to the Estate. Thus, the propriety of that disposition is not before us.

rather than to Decedent's estate. Specifically, Maura presents three issues

for our review:

1. Whether the orphans' court erred in failing to grant summary judgment in favor of Maura L. Nicotra?

2. Whether the orphans' court erred, following an evidentiary hearing, in ruling that the attorney-in-fact did not breach her fiduciary duty and/or exceed her authority under the terms of the [POA]?

3. Whether the orphans' court abused its discretion when it permitted [Arlene] to testify regarding authority she purportedly obtained outside of the [POA] to change the terms of the trust account, in violation of the Dead Man's Act and hearsay rules?

Appellant's brief at 6 (unnecessary capitalization omitted).

Initially, Maura contends that the trial court erred in denying her

motion for summary judgment. The law is well settled that

summary judgment is appropriate only in those cases where the record clearly demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. When considering a motion for summary judgment, the trial court must take all facts of record and reasonable inferences therefrom in a light most favorable to the non-moving party. In so doing, the trial court must resolve all doubts as to the existence of a genuine issue of material fact against the moving party, and, thus, may only grant summary judgment where the right to such judgment is clear and free from all doubt.

*Yenchi v. Ameriprise Fin., Inc.*, 161 A.3d 811, 818 (Pa. 2017) (quoting

*Summers v. Certainteed Corp.*, 997 A.2d 1152, 1159 (Pa. 2010))

(internal quotations and citations omitted).

Herein, the orphans' court denied summary judgment. "Our scope of review of a trial court's order granting or denying summary judgment is plenary, and our standard of review is clear: the trial court's order will be reversed only where it is established that the court committed an error of law or abused its discretion." *Abrams v. Pneumo Abex Corp.*, 981 A.2d 198, 203 (Pa. 2009); *see also Windows v. Erie Ins. Exch.*, 161 A.3d 953, 955 (Pa.Super. 2017). "[T]he issue as to whether there are no genuine issues as to any material fact presents a question of law, and therefore, on that question our standard of review is *de novo*. This means we need not defer to the determinations made by the lower tribunals." *Yenchi*, *supra* at 818.

The orphans' court was charged with determining, for purposes of summary judgment, whether there was a genuine issue of material fact to be tried. *See* Pa.R.C.P. 1035.2(1). At issue was the nature of the ITF account, whether Maura was entitled to those funds, and whether Arlene exceeded her authority under the POA when she closed that account and transferred the funds.

Maura argues that the record established that Arlene breached her fiduciary duty under the POA when Arlene diverted trust funds from her, the intended beneficiary, without lawful justification. She relies upon *Estate of Slomski v. Thermoclad*, 956 A.2d 438 (Pa.Super. 2008), in support of her position that the power of attorney is the sole measure of an agent's

authority and must be strictly construed. Maura contends that summary judgment was indicated because it was clear that Decedent's account was a trust account, and that the POA did not imbue Arlene with the specific power to modify Decedent's trust arrangements. Alternatively, if it was not a trust account, she contended that Arlene had no power under the POA to do what she did, *i.e.*, close one account and transfer those funds into a joint account that effectively resulted in a gift to herself.

Arlene countered that there were material issues of fact and law that were "zealously disputed," and which precluded the grant of summary judgment. She pointed to issues involving the nature of the bank account, the authority conferred by the POA, the Decedent's overall estate plan, and Arlene's use of the money, which involved credibility decisions. Appellees' brief at 11.[5] In addition, Arlene maintains that, in evaluating the August 13, 2014 POA at issue, Maura was relying incorrectly upon a version of the Decedents, Estates and Fiduciaries Code (the "PEF Code") that only became

_____

[5] The parties have advanced several technical arguments relative to the propriety of summary judgment. Maura would have us find that summary judgment should have been granted by default because Arlene did not file a point-by-point response to her motion, and she attached documentation to her brief in opposition rather than to a response. Arlene argues that summary judgment was properly denied as the motion was not supported by any affidavits, depositions, or admissions. She also faults Maura for failing to appeal the denial of the motion, which was not appealable at that time, and for seeking a retroactive grant of summary judgment post-trial. We find no abuse of discretion on the part of the orphans' court in ignoring the technical procedural arguments, none of which is dispositive, in favor of a decision on the merits.

effective on January 1, 2015, after the date the POA was executed herein. Furthermore, Arlene contended that the ITF account was nothing more than a bank account with a named beneficiary in the event of the owner's death. She relied upon the statutory presumption in 20 Pa.C.S. § 6303(b) that the ITF account was a revocable trust, that the Decedent retained control over the account during his lifetime, and that Maura had offered no evidence that it was irrevocable.

Certain principles govern powers of attorney. As this Court recently reiterated in ***In re Fiedler***, 132 A.3d 1010, 1021 (Pa.Super. 2016), "The scope of authority under a POA is determined by the language of the document creating the agency and the Code." ***See*** 20 Pa.C.S. §§ 5601-5611. For instance, the PEF Code addresses the proper manner in which a principal may authorize his agent to make gifts under a power of attorney. ***See*** 20 Pa.C.S. § 5603(a)(2) (power to make limited gifts); ***see also*** § 5603(m) (power to engage in banking and financial transactions); § 5603(b) (power to create a trust); and § 5603(f) (power to withdraw and receive the income or corpus of a trust).

Maura maintained that the ITF account was a trust account, and since the POA did not specifically authorize Arlene to engage in trust transactions, she lacked the power under that instrument to close that account and withdraw the funds. Even if it was not a trust account, Maura argues that

Arlene had no power to close and open another account or provide herself with a gift. Appellant's brief at 36.

Arlene characterized the ITF account as a bank account that would pass to the named beneficiary when the owner died. In opposition to summary judgment, Arlene supplied, *inter alia*, the affidavit of Matthew Mergo, the former Commonwealth Bank office manager, who facilitated the closing of the ITF account and the transfer of the funds. He averred therein that he had spoken to Decedent and obtained the approval of the bank's legal department before closing the ITF account, transferring the funds into Arlene's account, and adding Decedent to that latter account. Mr. Mergo recited that he explained to the Decedent what the change would mean, and that Decedent acknowledged his understanding. Decedent directed him to complete the transaction by retitling Arlene's existing account to a joint account so that she would immediately be able to write checks. Mergo Affidavit, 9/21/15. We find the affidavit alone raised disputed issues of fact and law, and we find no error or abuse of discretion on the part of the orphans' court in denying summary judgment on the record that existed at that time.

Second, Maura alleges that the orphans' court erred when it found after the evidentiary hearing that Arlene did not violate the POA when she closed the ITF account and transferred the funds to the joint account. Our standard of review of the findings of an orphans' court is deferential. ***In re***

*Estate of Harrison*, 745 A.2d 676, 678-79 (Pa.Super. 2000). We must determine whether the record is free from legal error and the court's factual findings are supported by the evidence. *Id*. We will not reverse the court's decision "unless there has been an abuse of discretion or a fundamental error in applying the correct principles of law." *In re Fiedler*, *supra* at 1018 (quoting *In re Estate of Whitley*, 50 A.3d 203, 206-7 (Pa.Super. 2012). Our standard of review of questions of law is *de novo*, and our scope of review is plenary. *Id*.

Maura contends that the court misapplied the law and ignored relevant testimony in arriving at its holding. Specifically, she faults the court for failing to credit the testimony of Attorney Kalmeyer, Decedent's attorney, who testified that the purpose of the POA was to enable Arlene to gain access to funds to pay her husband's medical expenses. She points to Attorney Kalmeyer's response to a hypothetical question that, "if Mrs. Jabbour, without providing any consideration to Mr. Jabbour, went and changed the account that she had no title or interest to and made it her own, do you believe that the Power of Attorney permitted that transaction to be done?" Attorney Kalmeyer responded that he did not think that "[t]he agent giving herself access to $106,000 as if it's her own," was permitted under the POA. N.T., 10/12-13/16, at 334.

Preliminarily, we note that the orphans' court, sitting as factfinder, was free to believe or disbelieve the testimony of the various witnesses, including

Attorney Kalmeyer, and we will not disturb those credibility findings unless they are unsupported in the record. Furthermore, with regard to the foregoing testimony, we find that the record does not support the facts assumed in the hypothetical question. Arlene did not make the account her own. She closed the ITF account owned by Decedent and transferred the funds into her account, which she then converted to a joint account with Decedent. Furthermore, the transfer was effectuated only after Mr. Mergo spoke to Decedent, the inference being that Decedent expressly authorized it.

Maura alleges that the POA did not authorize Arlene "to change, modify, or amend any of [Decedent's] trust arrangements (including any revocable trust arrangements)." Appellant's brief at 35. Furthermore, she asserts that the ITF designation was consistent with the Decedent's estate plan, as well as their Joint Will.[6] The right of survivorship, according to Maura, should have applied to determine the rights of the parties since the account was a trust account and Arlene had no power to act as a fiduciary as to a trust account. *See* 20 Pa.C.S. §6304(b). Alternatively, Maura claims that the POA did not authorize Arlene to make gifts, and thus she had no

_____

[6] Although Maura maintained that the account was one of the assets designated in the nuptial agreements for Decedent's children, she offered no proof thereof. Furthermore, the record indicates that more than $200,000 in assets were earmarked for Maura and her only surviving sibling.

power to close the trust account and open another account that resulted in a gift to herself.

Arlene counters that the ITF account was nothing more than a bank account that would pass to the named beneficiary when the owner died. She contends that the Multi-Party Account Act ("MPAA") governs the disposition of the ITF account, and that "[u]nless a contrary intent is manifested under the terms of the account or deposit agreement or there is other clear and convincing evidence of an irrevocable trust, a trust account belongs beneficially to the trustee during his lifetime.    20 Pa.C.S. § 6303(b)."[7]  Appellee's brief at 16.  There was no evidence that this was an irrevocable trust.  Maura, Arlene contends, had only an expectancy in the account, and no immediate right to the funds.  Decedent owned the account; he retained the power to withdraw or transfer funds or close the account throughout his lifetime.

_____

[7] Section 6303(b) provides:

> b)  Trust account. — Unless a contrary intent is manifested by the terms of the account or the deposit agreement or there is other clear and convincing evidence of an irrevocable trust, a trust account belongs beneficially to the trustee during his lifetime, and if two or more parties are named as trustees of the account during their lifetimes beneficial rights as between them are governed by subsection (a). If there is an irrevocable trust, the account belongs beneficially to the beneficiary.

20 Pa.C.S. § 6303(b).

Arlene disputes that she made a gift to herself of the proceeds of the account. She maintains that Decedent spoke to bank officials and authorized the transfer of the funds into what became a joint account, the inference being that Decedent, as the principal and owner of the account, approved the transfer of the funds to her.

Arlene is correct in her assertion that the POA at issue herein, executed on August 13, 2014, must be evaluated in light of the law existing when it was executed, which was prior to recent amendments to the PEF Code, effective January 1, 2015. Furthermore, the notice for the POA expressly references the law in effect at that time in defining the powers and duties of the agent. ("The powers and duties of an agent under a power of attorney are explained more fully in 20 Pa.C.S. Ch. 56."). The later enacted amendments do not govern herein.

As to the savings account established by Decedent in his own name and later changed to an ITF account for Maura, we find the following. Such an account is a totten trust, which is "essentially a 'poor man's will,' a judicial creation that, strictly speaking, is neither a will nor a trust, but is a fairly obviously testamentary transfer." ***Rellick-Smith v. Rellick***, 147 A.3d 897, 900 n.5 (Pa.Super. 2016) (cleaned up). The depositor "retain[s] complete control of the fund during his life and yet secure[s] to the beneficiary any balance standing in the account at the death of the

depositor." *In re Estate of McFetridge*, 372 A.2d 823, 825 (Pa. 1977).[8]

Until the death of the owner, the beneficiary has only an expectancy in the account because it is revocable at will during the lifetime of the depositor.[9] *Id*.

The POA expressly authorized Arlene to "Deposit or withdraw any money or property in any bank, saving and loan, investment funds or other place." POA, 8/13/14, at 2. We find that to be the equivalent of the power defined in the then-applicable PEF Code to "engage in banking and financial transactions," 20 Pa.C.S. § 5603(m), and which permitted the agent to open and close accounts in the name of the principal and transact any banking

_____

[8] *See Estate of McFetridge*, 372 A.2d 823, 825 (Pa. 1977), relying upon Section 58 of The Restatement (Second) of Trusts, which provides as follows:

> Where a person makes a deposit in a savings account in a bank or other savings organization in his own name as trustee for another person, intending to reserve a power to withdraw the whole or any part of the deposit at any time during his lifetime and to use as his own whatever he may withdraw, or otherwise to revoke the trust, the intended trust is enforceable by the beneficiary upon the death of the depositor as to any part remaining on deposit on his death if he has not revoked the trust.

[9] Maura Nicotra has standing as the beneficiary of the ITF account to challenge Arlene's use of the POA to revoke the account. *See Rellick-Smith*, 147 A.3d 897, 900 n.5 (Pa.Super. 2016) (citing Scott on Trusts, (4th Ed. 1987) § 58.4, p. 224) (finding beneficiary had standing to challenge agents' withdrawal of money from the account before the death of the depositor and without his consent, acting pursuant to a power of attorney).

business that the principal could do if present. 20 Pa.C.S. § 5603 (m)(2) and (6) (effective October 27, 2010).

No one disputes that Decedent had the power to withdraw the money from the ITF account during his lifetime. Furthermore, the evidence established that the action was not unilateral on the part of Arlene. Mr. Mergo testified that the ITF account was closed and the money transferred only after he personally spoke to Decedent and explained the consequences of the transfer. Thus, Decedent authorized the closing of the account and transfer of funds or ratified Arlene's use of the POA for that purpose. Furthermore, Maura's attempt to characterize Decedent's authorization as an oral modification of the POA is unpersuasive. Decedent's execution of the POA did not preclude him from continuing to exercise control over his accounts.

We find that the record supports the orphans' court's finding that Arlene had the power to withdraw funds from the ITF account during Decedent's lifetime, change the beneficiary on the account, or revoke the ITF designation entirely. The ITF designation and the addition of a beneficiary in 2009 did not change Decedent's ownership of the account. Mr. Mergo confirmed that the ITF account herein was revocable and that Maura had no right to the funds until Decedent's death. Since the POA conferred upon Arlene the same rights possessed by Decedent, she was authorized to close the ITF account. Furthermore, Arlene's deposit of the

funds into an account that she converted into a jointly-held account with Decedent was within her power under the POA, and also authorized by Decedent personally. Thus, we find ample support for the court's finding that Arlene did not misuse the written durable POA or unlawfully convert funds belonging to the Decedent or Maura.

Nor did Arlene exceed the scope of her authority when she expended funds from the account. Sitting as factfinder, the court found that the funds from the closed account were used for Decedent's expenses, and that if Decedent had chosen to do so, he could have used funds from the account for his own expenses at any time. The court concluded that Arlene was simply acting pursuant to the POA in her husband's stead. Although the transfer of Decedent's funds into the joint account with Arlene may have resulted in a gift to her, the orphans' court nevertheless ordered the balance of the remaining funds to be placed in the Estate, not disbursed to Arlene.[10] Thus, the orphans' court concluded that Maura had no claim to the funds, and we find no error or abuse of discretion in the orphans' court's decision.

_____

[10] Arlene maintains that the account was a tenancy by the entireties, and that she was entitled to the funds remaining in the account as the surviving entireties tenant. In placing the remaining funds in the Estate, the orphans' court noted only that the funds "may have been protected under the terms of the parties' Prenuptial Agreement and the Addendum thereto, along with the Post-Nuptial Agreements." Orphans' Court Opinion, 12/14/16, at unnumbered 5 n. 1.

Finally, Maura contends that the orphans' court erred in permitting Arlene to testify to matters that were barred by the Dead Man's Act, 42 Pa.C.S. § 5930. This was the subject of a motion *in limine* filed by Maura prior to trial, as well as continuing objections throughout the proceeding. As with all evidentiary rulings, we apply an abuse of discretion standard of review:

> Questions concerning the admissibility of evidence lie within the sound discretion of the trial court, and we will not reverse the court's decision absent a clear abuse of discretion. An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support as to be clearly erroneous. In addition, to constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party.

***Crespo v. Hughes***, 167 A.3d 168, 177-78 (Pa.Super. 2017) (internal quotation marks and internal citations omitted).

> The Dead Man's Act provides in relevant part that

> in any civil action or proceeding, where any party to a thing or contract in action is dead . . . and his right thereto or therein has passed . . . to a party on the record who represents his interest in the subject in controversy, neither any surviving or remaining party to such thing or contract, nor any other person whose interest shall be adverse to the said right of such deceased . . . shall be a competent witness to any matter occurring before the death of said party . . .

42 Pa.C.S. § 5930.

The purpose of the Dead Man's Act is to stave off possible injustice where a surviving party to a transaction who is adverse to the decedent is permitted to testify to matters that decedent's representative cannot refute

- 19 -

due to death. ***Weschler v. Carroll***, 578 A.2d 13 (Pa. 1990); ***In re Estate of Hall***, 535 A.2d 47 (Pa. 1987); ***In re Estate of Petro***, 694 A.2d 627 (Pa.Super. 1997).

For the Dead Man's Act to disqualify a witness from testifying, three prerequisites must be established: (1) the deceased must have had an actual right or interest in the matter at issue; (2) the interest of the witness, not simply the testimony, must be adverse; and (3) a right of the deceased must have passed to a party of record who represents the deceased's interest. ***In re Hendrickson's Estate***, 130 A.2d 143 (Pa. 1957). An adverse interest is one where the witness will either gain or lose as a direct legal operation in effect of the judgment. ***In re Estate of Gelb***, 228 A.2d 367 (Pa. 1967).

The specific error Maura alleges is that the court permitted Arlene to testify, in violation of the Dead Man's Act, that Decedent approved of the closing of the account and transfer of the funds. Maura contends that all three prerequisites for the application of the Act were satisfied herein, and that the testimony should have been barred. She argues first that Decedent was the owner of the ITF account. Second, Arlene's interest was adverse to that of Decedent because "she intentionally converted more than $100,000 through the use of a POA." Appellant's brief at 52. In addition, Maura maintains that she is the party of record, *i.e.*, the Co-Executrix, who represents the Decedent's interest.

Maura argues further that, the Dead Man's Act aside, a surviving wife is prohibited from testifying regarding civil contracts with her deceased husband, regarding ante-nuptial and postnuptial agreements, and statements about the decedent's testamentary intentions. **See** 9 Standard Pennsylvania Practice 2d, § 54:35.

According to Arlene, Maura was representing her own individual interest, not that of the Decedent, in seeking to invalidate the closing of the ITF account and transfer of the funds to herself. Moreover, Arlene characterizes herself as the putative transferee of an *inter vivos* transfer by Decedent. She cites **Friedeman v. Kinnen**, 305 A.2d 3 (Pa. 1973), in support of her contention that, once she demonstrated a valid *inter vivos* transfer with independent evidence from Mr. Mergo, she was competent to testify as the representative of the Decedent.

In **Friedeman**, **supra** at 4, our Supreme Court cited **Ford Estate**, 245 A.2d 443 (Pa. 1968), for the proposition that "application of the 'Dead Man's Act' is difficult where there are allegations of an *inter vivos* gift by the decedent to the challenged donee." Our High Court further explained that, in such situations, both the alleged donee and the estate have an interest in the property which may be adverse to the interest of the decedent, depending on whether the alleged transfer took place or not." **Id**. The Court applied the holding in **Ford** that, "if a valid *inter vivos* transfer can be shown by independent evidence before the admission of any testimony by

the alleged donee, the donee will be considered to represent the interest of the decedent and will be permitted to testify." *Id*. If not, the putative donee would not be competent to testify.

The orphans' court did not explain its rationale for permitting Arlene to testify over an objection based on the Dead Man's Act. However, the record establishes that Mr. Mergo testified prior to Arlene. He confirmed that the bank's legal department reviewed the POA, and that he personally spoke to Decedent while he was in the hospital and explained the nature of the proposed transactions. Based on that conversation, Mr. Mergo facilitated the closing of the ITF account and the transfer of the funds to the existing account owned by Arlene, and added Decedent as a co-owner. Mr. Mergo's testimony was *prima facie* independent evidence of a valid *inter vivos* transfer; as the putative transferee, Arlene was then competent to testify as the Decedent's representative. **Friedeman**, **supra**; **Ford**, **supra**; **see also King v. Lemmer**, 173 A. 176 (Pa. 1934). Her testimony was largely cumulative of Mr. Mergo's with regard to the closing of the ITF account and the transfer of the funds into a joint account. In light of these facts, we find no violation of the Dead Man's Act in permitting Arlene to offer this testimony.[11]

_____

[11] The Joint Will and nuptial agreements, together with addendums, were introduced into evidence. Arlene did not offer any testimony regarding Decedent's testamentary intent.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/17/2018